ANDREW L. PACKARD (State Bar No. 168690)
MEGAN E. TRUXILLO (State Bar No. 275746)
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com

REED W. SUPER (State Bar No. 164706)
SUPER LAW GROUP, LLC
411 State Street, Suite 2R
Brooklyn, New York 11217
Telephone: (212) 242-2355
Facsimile: (855) 242-7956
Email: reed@superlawgroup.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit public benefit corporation organized under the laws of the State of California,<br><br>     Plaintiff,<br><br>     v.<br><br>PACIFIC STATES INDUSTRIES, INC., NORTH CLOVERDALE BLVD., LLC;<br><br>     Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE (hereinafter "CSPA"), by and through its counsel, hereby alleges:

**I.      JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the

Act"). This complaint seeks relief for unlawful discharges of polluted storm water and non-storm water by Pacific States Industries, Inc., and North Cloverdale Blvd., LLC (collectively "Defendants") from their industrial facility, the Redwood Empire Sawmill ("the Facility"), into waters of the United States in violation of the Clean Water Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Industrial Storm Water Permit" or "Permit"). Defendants' violations of the discharge prohibitions, treatment technology requirements, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous. There is a real and present controversy between the parties. Plaintiff seeks declaratory and injunctive relief, the assessment of substantial civil penalties, and an award of its reasonable fees and costs. 28 U.S.C. §§ 2201 and 2202 (declaratory judgment action).

2.     This Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suits authorized by the Clean Water Act), and 28 U.S.C. § 1331 (actions arising under the laws of the United States).

3.     Venue is appropriate in this District and Court pursuant to 28 U.S.C. § 1391(b) and pursuant to 33 U.S.C. § 1365(c)(1), because the events and omissions giving rise to these claims occurred within this judicial district.

4.     On January 29, 2015, Plaintiff provided written notice to Defendants of their violations of the Clean Water Act and of Plaintiff's intention to file suit for such violations ("Notice Letter"). The Notice Letter alleges, inter alia, violations of the General Industrial Storm Water Permit. Notice was also provided to the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), the Executive Officer of the Regional Water Quality Control Board, North Coast Region

("Regional Board"), and the U.S. Department of Justice as required by the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A) and 40 CFR § 135.2 (b).  A true and correct copy of the Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

5.    More than sixty days passed after service of the notice on Defendants.  Plaintiff is informed, believes, and thereupon alleges that no state or federal Agency, including but not limited to, the EPA, the State Board or the Regional Board, has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act.  33 U.S.C. § 1319(g).

## II.    PARTIES

### A.    California Sportfishing Protection Alliance

6.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Oat Valley Creek, the Russian River and the Pacific Ocean.  CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.    Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the waters of the Oat Valley Creek, the Russian River and the Pacific Ocean, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, boat, swim, birdwatch, view wildlife or engage in scientific study, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE          3
RELIEF & CIVIL PENALTIES

been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, its members, and other citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## **B.     Defendants**

9.     The Redwood Empire Sawmill is a division of Defendant Pacific States Industries, Inc. ("Pacific States"), which operates the sawmill located at 31401 McCray Road in Cloverdale, California (the "Facility").  The Facility's mailing address is listed as Post Office Box 156, Cloverdale, CA 95425.

10.     CSPA is informed and believes that Pacific States is doing business as "Redwood Empire" and/or "Redwood Empire Sawmill."  Information available to CSPA indicates that Roger A. Burch is the President and Registered Agent of Pacific States and that Nolan Schweikl is the Facility's Operations Manager.  Pacific States maintains offices at 2 West Santa Clara Street, 9th Floor, San Jose, California.  Information available to CSPA indicates that Pacific States holds title to APN 115-150-069 on which a portion of the Facility is located. Plaintiff is informed and believes, and thereupon alleges that Pacific States is an owner and/or operator of the Facility.

11.     Plaintiff is informed and believes that North Cloverdale Blvd., LLC, holds title to APN 115-150-045 on which a portion of the Facility is located.  Information available to CSPA indicates that Roger A. Burch is also the Registered Agent for North Cloverdale Blvd., LLC at 2 West Santa Clara St. 9th Floor, San Jose, CA 95113.  Plaintiff is informed and believes, and thereupon alleges, that North Cloverdale Blvd. LLC is an owner and/or operator of the Facility.

12.     In October 2007, Defendants were named as defendants in a lawsuit filed by the Russian Riverkeeper, a non-profit public benefit corporation, in the United States District Court, Northern District of California (Civil Case No. C-07-5393 MHP) stemming from prior

violations of the General Industrial Storm Water Permit and the Clean Water Act at the Facility. On September 3, 2008, the Honorable Judge Marilyn Hall Patel signed a consent decree requiring, among other things, various compliance measures, employee training, revisions to the Facility's Storm Water Pollution Prevention Plan, and development of a Monitoring & Reporting Program. That decree expired on September 4, 2014.

## III.  STATUTORY AND REGULATORY BACKGROUND

### A.  The Clean Water Act

13.  Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of a pollutant into waters of the United States unless the discharge is in compliance with various sections of the Act. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit a National Pollution Discharge Elimination System ("NPDES") permit application. 33 U.S.C. §§ 1342(a). Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.  Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* §1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [Section 402] of this title," and "any unlawful act under subsection (a) of [Section 301] of this title").

15.  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

16.  Section 402(p) of the Act establishes a framework for regulating municipal and

industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.

13.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**B.     The General Industrial Storm Water Permit**

14.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Industrial Storm Water Permit on or about November 19, 1991, modified the Permit on or about September 17, 1992, and reissued the Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

15.     Discharge Prohibition A(1) of the General Industrial Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the Permit prohibits storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

16.     Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

17.     Receiving Water Limitation C(2) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.    The General Industrial Storm Water Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

19.    Effluent limitation (B)(3) of the General Industrial Storm Water Permit requires facility operators to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

20.    The EPA has established benchmark values for certain pollutants, the exceedance of which is considered a level of concern. 65 Fed. Reg. at 64766. The level of concern is a concentration at which a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish. *Id*. Thus, the benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. *Id*. at 64766-67. EPA has established the following Benchmark Values for pollutants in or likely to be in Defendants' discharges, including but not limited to: pH – 6.0-9.0; Total Suspended Solids ("TSS") – 100 mg/L; Oil & Grease – 15.0 mg/L; Chemical Oxygen Demand ("COD") – 120 mg/L; Zinc – 0.117 mg/L; Aluminum – 0.750 mg/L; Magnesium – 0.0636 mg/L; Arsenic – 0.16854 mg/L; copper – 0.0636 mg/L; Iron – 1.0 mg/L; Lead – 0.816 mg/L; mercury – 0.0024 mg/L; nitrate + nitrite ("N+N") – 0.68 mg/L; Ammonia – 19.0 mg/L; and Biological Oxygen Demand ("BOD") – 30.0 mg/L (5-day).[1] 65 Fed. Reg. 64767 (Table 3).

21.    Section A(1) and Provision E(2) of the General Industrial Storm Water Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention

---

[1] The State Board has proposed adding a benchmark level for specific conductance of 200 μmho/cm and for total organic carbon of 110 mg/L. *See* Draft General Industrial Storm Water Permit (California State Water Board, December 2004), at 25 (Table VIII.2).

Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Permit.

22.     The objective behind the SWPPP requirements is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Facility, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges.  General Industrial Storm Water Permit, Section A(2).

23.     To ensure its effectiveness, Sections A(9) & (10) of the General Industrial Storm Water Permit requires the SWPPP to be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit.

24.     Sections A(3) through A(10) of the General Industrial Storm Water Permit set forth the requirements for a SWPPP.

25.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity.  General Industrial Storm Water Permit, Section A(4).

26.     The SWPPP must also include a list of significant materials handled and stored at the site (General Industrial Storm Water Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; a description of significant spills and leaks; a list of all non-storm water discharges and their sources; a description of locations where soil erosion may occur (General Industrial Storm Water Permit, Section A(6)); and an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Industrial Storm Water Permit, Sections A(7) and (8)).

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                           8
RELIEF & CIVIL PENALTIES

27.     The General Industrial Storm Water Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program ("MRP") no later than October 1, 1992.  Existing facilities covered under the Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

28.     Sections B(3) through B(16) of the General Industrial Storm Water Permit set forth the Monitoring & Reporting Program requirements ("M&RP"). The objective of the M&RP is to ensure that storm water discharges are in compliance with the Industrial Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  General Industrial Storm Water Permit, Section B(2).  The MRP must ensure that BMPs utilized at the facility are reducing or preventing pollutants in storm water discharges, and are evaluated whenever appropriate.  General Industrial Storm Water Permit, Section B(2)(a).

29.     Section B(3) of the General Industrial Storm Water Permit requires dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges on a quarterly basis, to document the source of any discharge, and to report the presence of any discolorations, stains, odors or floating materials in the discharge.

30.     Section B(4) of the General Industrial Storm Water Permit requires dischargers to visually observe storm water discharges at all discharge locations from one storm event per month during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants. Section B(4) also provides that visual observations are only required of storm water discharges that occur during daylight hours that are preceded by at least three (3) working days without storm water discharges and that occur during scheduled facility operating hours.

31.     Sections B(3)(d) and B(4)(c) of the General Industrial Storm Water Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or

1  prevent pollutants from contacting non-storm water and storm water discharges.

2      32.    Section B(5) of the General Industrial Storm Water Permit requires dischargers to

3  collect a sample from all discharge points during the first storm event of the wet season and

4  during at least one other storm event of the wet season, for a total of two samples per wet

5  season.

6      33.    Section B(5)(c) of the General Industrial Storm Water Permit requires

7  dischargers to analyze each sample for pH, specific conductance, TSS, and TOC (or oil and

8  grease), in addition to any applicable parameters listed on Table D of the Permit and any toxic

9  chemicals or other pollutants likely to be present in significant quantities in the storm water

10  discharged from the Facility.

11      34.    Section B(14) of the General Industrial Storm Water Permit requires dischargers

12  to submit signed and certified "Annual Reports" to the Regional Board by July 1st of each

13  year.

14  **C.    The North Coast Basin Plan**

15      35.    The State Water Quality Control Board, North Coast Region, has issued the

16  Water Quality Control Plan for the North Coast Region ("the Basin Plan") to establish water

17  quality objectives, implementation plans for point and non-point source discharges,

18  prohibitions, and to further statewide plans and policies.  The Basin Plan provides that "[t]he

19  pH shall not be depressed below 6.5 nor raised above 8.5."  The Basin Plan also provides that

20  "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal to or

21  that produce other detrimental responses in aquatic organisms."  The Basin Plan also

22  establishes that the dissolved oxygen levels of the stretch of the Russian River to which the

23  Facility discharges may not be depressed below 7.0 mg/L.  Basin Plan, Table 3-1.  The Basin

24  Plan sets forth water quality objectives for dissolved metals, such as arsenic, lead, and mercury.

25  *Id*., Table 3-4.  The Basin Plan also states that the waters shall not receive sediment, settleable

26  materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial

27  uses.  *Id*.

28

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE        10
RELIEF & CIVIL PENALTIES

## IV.     STATEMENT OF FACTS

### A.     Redwood Empire

36.     On or about April 16, 1992 and again on or about May 7, 1997, Redwood Empire submitted notices of intent to comply with the terms of the General Industrial Storm Water Permit ("Notice of Intent to Comply" or "NOI").  The Facility was assigned the WDID number 1 49I006163.

37.     Information available to Plaintiff indicates that the Facility includes a sawmill, planer, kiln, remanufacturing facility, fuel storage, and at least six acres of unpaved log deck.  This information also indicates that there is also an ammonia storage tank to store ammonia used to treat sawdust for use as a soil amendment.  Defendants have reported to the Regional Board that the Facility is classified under Standard Industrial Classification Codes 2411 ("Log Storage and Handling"), 2421 ("General Sawmill/Planing Mill") and 2499 ("Wood products, not classified elsewhere").

38.     Defendants conduct industrial activities that include the loading and unloading, processing, storage, and transfer of lumber, wood products, and associated industrial materials.  Plaintiff is informed and believes that that the northern and southern portions of the Facility are primarily used for lumber storage and processing and that the middle section of the property contains several buildings, including at least ten structures that contain most of the milling, chemical storage, and office space.  The 1997 NOI states that the property is 24 acres and 10% paved or covered with impervious structures.

39.     Plaintiff is informed and believes, and thereupon alleges that operations at the Facility occur principally outside, without cover, and/or without the implementation of sufficient Best Management Practices (hereinafter "BMPs") to prevent the contamination of storm water at the Facility.  Additionally, Plaintiff is informed and believes, and thereupon alleges, that Defendants have not adequately developed and implemented BMPs that would prevent storm water from discharging from the Facility after it is exposed to and contaminated by pollutants at the Facility.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                    11
RELIEF & CIVIL PENALTIES

40.     According to Defendants' SWPPP and self-monitoring reports, storm water discharges from the Facility through at least two discharge points to the adjacent Oat Valley Creek. All of the storm water and non-storm water discharges at the Facility go into Oat Valley Creek, approximately 300 yards above Oat Valley Creek's confluence with the Russian River.

41.     Plaintiff is informed and believes that Oat Valley Creek is a water of the United States and is a tributary to the Russian River.  The Russian River is a water of the United States.

42.     Plaintiff is informed and believes, and thereupon alleges, that pollutants discharged from the site include, but are not limited to: fugitive sawdust; wood debris; sediment; metals; biological and industrial wastes; ammonia; nitrites and nitrates; oxygen-demanding substances; and lubricants, fuels and other fluids and toxic chemicals associated with the Facility's operations including but not limited to the maintenance of large trucks, lifts and other heavy machinery and vehicles.

43.     According to Defendants' self-monitoring reports submitted to the Regional Board, Defendants have measured discharges containing levels of TSS, pH, TOC, BOD, COD Magnesium and Zinc in excess of the EPA Benchmark Values on at least one hundred occasions since March 31, 2010.  Self-monitoring reports filed pursuant to an NPDES permit that report exceedances of permit limitations constitute "conclusive evidence" of violations of the permit and the Act.  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988) *rev'd on other grounds,* 485 U.S. 931, *amended by* 853 F.2d 667.

44.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have operated the Facility in continuous violation of the Clean Water Act and the General Industrial Storm Water Permit since at least March 31, 2010 by, *inter alia*, discharging storm water and non-storm water containing impermissible levels of Total Suspended Solids, pH, COD, BOD, TOC, Zinc and Magnesium and other pollutants associated with Defendants' industrial operations into the waters of Oat Valley Creek and the Russian River, without complying with the terms of the General Industrial Storm Water Permit.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                    12
RELIEF & CIVIL PENALTIES

45.     Defendants have taken samples of the storm water and non-storm water discharges at the Facility and had them analyzed by a laboratory on at least 26 occasions (with samples collected from two discharge points during each rain event).  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board for the Wet Seasons 2010-2011, 2011-2012, 2012-2013, and 2013-2014 Wet Seasons.

46.     According to Defendants' self-monitoring reports, since at least March 31, 2010, Defendants have known that storm water discharged from the Facility contains concentrations of: TSS in excess of EPA Benchmark Value of 100 mg/L; COD in excess of EPA Benchmark Value of 120 mg/L; BOD in excess of EPA Benchmark value of 30 mg/L; and Magnesium in excess of EPA Benchmark value of 0.0636 mg/L.  Since at least October 29, 2010, Defendants have known that storm water discharged from the Facility contains concentrations of TOC in excess of the EPA Benchmark value of 110 mg/L, and Zinc in excess of EPA Benchmark value of 0.117 mg/L.  Since at least November 30, 2012, Defendants have known that storm water discharged from the Facility contains concentrations of pH Levels in excess of the EPA Benchmark Value of 6.0-9.0 s.u.

47.     On at least seven documented occasions since March 31, 2010, the levels of TSS detected by Defendants in the storm water discharged from its Facility exceeded the Benchmark Value of 100 mg/L for TSS.

48.     On at least twenty-three documented occasions since March 31, 2010, the concentrations of COD detected by Defendants in storm water discharged from the Facility exceeded the Benchmark Value of 120 mg/L for COD.

49.     On at least twenty-four documented occasions since March 31, 2010, the concentrations of BOD detected by Defendants in storm water discharged from the Facility exceeded the Benchmark Value of 30 mg/L for BOD.

50.     On at least twenty-seven occasions since March 31, 2010, the concentrations of Magnesium detected by Defendants in storm water discharged from the Facility exceeded the Benchmark Value of 0.0636 mg/L for Magnesium.

51.     On at least four occasions since October 29, 2010, the concentrations of TOC detected by Defendants in storm water discharged from the Facility exceeded the Benchmark Value of 110 mg/L for TOC.

52.     On at least fourteen occasions since October 29, 2010, the concentrations of Zinc detected by Defendants in storm water discharged from the Facility exceeded the Benchmark Value of 0.117 mg/L for Zinc.

53.     On at least one occasion since November 30, 2010, the pH level detected by Defendants in storm water discharged from the Facility exceeded the benchmark value of 6.0-9.0 s.u. for pH.

54.     Defendants have violated and will continue to violate Effluent Limitation B(3), Discharge Prohibition A(2), and/or Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit by failing to develop and/or implement BMPs that achieve compliance with the BAT and BCT requirement.  The Facility's exceedances of EPA Benchmarks provided above indicate that Defendants have not implemented BAT and BCT at the Facility for its discharges of TSS, pH, COD, BOD, TOC, Zinc, and Magnesium.  Every day since January 29, 2010 that Defendants have failed and continue to fail to develop and implement BMPs that achieve BAT and BCT standards at the Facility is a separate and distinct ongoing violation of both the Permit and Sections 301(a) and Section 402 of the CWA, 33 U.S.C. §§1311(a), 1342.

55.     Plaintiff is further informed and believes, and thereupon alleges, that since at least January 29, 2010, Defendants have failed to implement and maintain an adequate MRP as required by Section B of the Permit. Defendants have failed to collect storm water samples during at least two qualifying storm events, as defined by the Permit, during at least three of the past five Wet Seasons.  Defendants have failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility including: Aluminum, Arsenic, Copper, Iron, Lead, Mercury, Nitrate+Nitrite, and Ammonia. In addition, Defendants have failed to employ adequate testing methods in violation of the

1   Permit since January 29, 2010.

2       56.   For the past three wet seasons, Defendants have either reported that they did not

3   sample the first qualifying storm event of the season or have falsely reported that they sampled

4   the first qualifying storm event of the season, when in fact Defendants have failed to do so.

5   Defendants reported in their 2010-2011 Annual Report that they sampled the first qualifying

6   storm event of the wet season, but Defendants first sample is from October 29, 2010. Based

7   upon review of publicly available rainfall data, Plaintiff is informed and believes that the first

8   qualifying storm event of the 2010-2011 Wet Season occurred as early as October 23, 2010,

9   when 1.36" of rain fell on the Facility.  These failures to adequately monitor storm water

10   discharges constitute separate and ongoing violations of the General Industrial Storm Water

11   Permit and Section 301(a) and Section 402 of the CWA, 33 U.S.C. §§1311(a), 1342.

12       57.   Plaintiff is further informed and believes, and thereupon alleges, that Defendants

13   have failed to analyze their storm water samples for all pollutants that are "likely to be present

14   in storm water discharges in significant quantities" including, but not limited to aluminum,

15   arsenic, copper, lead, mercury, nitrate + nitrite, ammonia and other pollutants associated with

16   industrial activities at the Facility, as required under Section B(5)(c)(ii) of the General

17   Industrial Storm Water Permit. Each failure to adequately monitor storm water discharges for

18   all pollutants is a separate and ongoing violation of the General Industrial Storm Water Permit

19   and Section 301(a) and Section 402 of the Act, 33 U.S.C. §§1311(a), 1342.

20       58.   Defendants have reported in every single annual reported they have filed since

21   January 29, 2010 testing methods that do not comply with the terms of the Permit. The

22   Regional Board has determined the appropriate laboratory test methods to employ when

23   analyzing storm water sampled for presence and concentration of pollutants, as well as the

24   appropriate detection limits for those testing methods. For example, the testing method

25   Defendants were required to apply for COD was SM 5220C with a detection limit of 1 mg/L.

26   However, Defendants' 2013-2014 Annual Report indicates the laboratory utilized test method

27   SM 5220D with a detection limit of 50 mg/L. In addition, Defendants' 2011-2012 Annual

28

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE          15
RELIEF & CIVIL PENALTIES

Report indicates that the detection limits for Zinc and Magnesium were above the required detection limits by at least an order of magnitude. These failures to apply adequate laboratory testing methods constitute separate and ongoing violations of Section B of the General Industrial Storm Water Permit and Section 301(a) and Section 402 of the Act, 33 U.S.C. §§1311(a), 1342.

59.    Plaintiff is informed and believes that at least every day since January 29, 2010 on which storm water is discharged from the Facility, which Plaintiff alleges occurs on every rain event measuring 0.1 or more inches of precipitation, Defendants have discharged and will continue to discharge storm water containing concentrations of pollutants including but not limited to TSS, pH, COD, BOD, TOC, Zinc and Magnesium in excess of Permit terms, including but not limited to applicable water quality standards. Defendants' violations will continue each day contaminated storm water or unauthorized non-storm water is discharged in violation of the requirements of the Permit.

60.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate SWPPP. Defendants have been operating with an inadequately developed or implemented SWPPP, in that Defendants have failed to evaluate the effectiveness of their BMPs and to revise their SWPPP as necessary. Accordingly, Defendants have been in continuous violation of Section A(1) and Provision E(2) of the permit every day since January 29, 2010, and will continue to be in violation every day that they fail to develop and implement an effective SWPPP.

61.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to address discharges contributing to exceedances of water quality standards. Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Waterboard describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP. As indicated above, Defendants are

discharging elevated levels of TSS, pH, COD, BOD, TOC, Zinc and Magnesium, as well as other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Defendants were required to submit a report pursuant to receiving water limitation C(4)(a) within 60 days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.  Defendants were aware of high levels of these pollutants long before January 29, 2010. Defendants have been in continuous violation of Receiving Water Limitation C(4) and Sections C(11)(d) and A(9) of the permit, and Section 301(a) of the CWA, 33 U.S.C. §1311(a), every day since January 29, 2010 and will continue to be in violation every day they fail to prepare and submit the requisite reports, and receive approval from the Regional Board, and amend its SWPPP to include approved BMPs.

62.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to file complete, true and accurate Annual Reports and evaluations of storm water controls by July 1st of each year as required by Sections A(9)(d), B(14), and C(9) & (10) of General Industrial Storm Water Permit.  For example, Defendants reported in four Annual Reports filed for the past four Wet seasons (i.e. 2009-2010, 2010-2011, 2011-2012 and 2013-2014) that they observed storm water discharges occurring during the first storm of those Wet Seasons.  However, based on review of publicly available rainfall data, Plaintiff believes this is incorrect.  For example, in the 2011-2012 Annual Report, Defendants reported that they sampled the first qualifying storm event of the Wet Season, but Defendants first sample is from January 20, 2012. Based upon review of publicly available rainfall data, Plaintiff is informed and believes that the first qualifying storm event of the 2011-2012 Wet Season occurred as early as October 3, 2011, when 0.85" of rain fell on the Facility. These failures to adequately monitor storm water discharges constitute separate and distinct violations of the Permit and the Act.

63.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to sample from qualifying storm events in two of the last five Wet Seasons in violation

of the Permit. For example, in 2010-2011 Annual Report Defendants reported that it sampled from five qualifying storm events throughout the wet season.  However, none of those samples was taken during a qualifying storm event.  Defendants reported that it sampled from a storm that occurred at the Facility on February 16, 2011. Based upon review of publicly available rainfall data, Plaintiff is informed and believes that February 16, 2011 was not a qualifying storm event because 0.24 inches of rain fell on the Facility on February 15, 2011. Accordingly, the February 15th storm event rendered any storm occurring for three days afterwards non-qualifying under the Permit.  Defendants have violated the Permit every time they have submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the last five years. Defendants' failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.

64.     Plaintiff is informed and believes, and thereupon alleges, that as a result of Defendants' failure to comply with the Act and the Permit, pollutants have been, and continue to be, discharged from the Facility to Oat Valley Creek and the Russian River.  Plaintiff is informed and believes, and thereupon alleges, that these discharges adversely affect the beneficial uses and ecological health of the waterways into which Defendants are discharging pollutants.

## B.     The Russian River

65.     The Russian River watershed is approximately 100 miles long and from 12 to 32 miles wide, draining an area of some 1,485 square miles.  The headwaters of the Russian River are about 16 miles north of Ukiah.  The river flows southward for 90 miles through Redwood, Ukiah, Hopland, and Alexander Valleys, and through the northwestern part of the Santa Rosa Plain, before entering the Pacific Ocean at Jenner.  The principal tributaries of the Russian River are East Fork, Sulphur Creek, Mayacama Creek, Dry Creek and Mark West Creek.  Oat Valley Creek, which runs along the north-eastern edge of the Facility, joins the Russian River in Cloverdale.

66.     The Russian River is home to three species of salmonids: coho salmon, chinook

salmon and steelhead trout.  All three species have experienced severe population declines and are listed as threatened under the Endangered Species Act, with coho also listed as "endangered" under the California Endangered Species Act.  The Russian River is also home to other species whose populations are threatened, endangered or declining to a level of concern, including but not limited to, freshwater shrimp (Federally Endangered/State Endangered); Western pond turtles (California Species of Concern); western tailed frogs (California Species of Concern); California tiger salamanders (Federally Proposed for Listing/State Species of Concern); and foothill yellow-legged frogs (California Species of Concern).  In addition, frogs, salamanders, snakes, muskrats, beavers, and river otters live in the watershed.  Various trees grow along the stream banks and attract large numbers of resident and migratory birds.  An entangling under story of shrubs, flowering plants, and vines provides sites for nesting, shelter and shade for many animals.  Algae and mosses proliferate in the water and on rocks.  Insects thrive here and in turn provide an abundant food source for invertebrates, fish, and birds.  *California Coastal Commission's California Coastal Resource Guide*, at http://ceres.ca.gov/ceres/calweb/coastal/streams.html ("CCC Online Coastal Resource Guide: Streams").

67.    Riverkeeper is informed and believes that salmonids also spawn or attempt to spawn in Oat Valley Creek, directly adjacent to the Facility; other threatened or endangered species and other wildlife also make use of Oat Valley Creek in areas downstream from the Facility.

68.    The North Coast Regional Board's Water Quality Control Plan ("Basin Plan") designates numerous beneficial uses for the Russian River.[2]  Beneficial uses are intended to

---

[2] According to the Basin Plan, the Russian River's beneficial uses include: municipal; agriculture, industrial, groundwater (in some reaches of the river); freshwater; navigation; hydroelectric power (potential); water contact recreation, non-water contact recreation, commercial and sport fishing; warm freshwater habitat; cold freshwater habitat; spawning, reproduction, and/or early development; wildlife habitat; rare and endangered species; migration of aquatic organisms; and estuarine habitat (in some reaches of the river).  *Water Quality Control Plan, North Coast Region*, Regional Water Quality Control Board, North Coast Region, Table 2-1 (2006).

represent the purposes of the water body that are specifically protected by the Clean Water Act. When those uses are not attained, the Regional Board designates the water body as impaired under Section 303(d) of the Clean Water Act.  The North Coast's 303(d) list indicates that the Russian River is impaired for sediment/siltation and temperature on the entire river, and impaired by low dissolved oxygen, nitrogen, phosphorous, and pathogens on some reaches of the river.  Therefore, the receiving waters for pollution from the Facility are impaired, and the Defendants' illegal discharge of pollution contributes to the continued impairment of the Russian River's beneficial uses.

## V.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Develop and Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

69.    Plaintiff realleges and incorporates the preceding Paragraphs, as if fully set forth herein.

70.    The Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BMPs that achieve compliance with BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

71.    Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of Effluent Limitation B(3) of the Permit.

72.    Each day since January 29, 2010 that Defendants have failed to develop and implement BMPs to achieve compliance with BAT and BCT in violation of the Permit is a separate and distinct violation of Section 301(a) and Section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

73.    Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiff and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE                    20
RELIEF & CIVIL PENALTIES

1    Wherefore Plaintiff prays for relief as hereinafter set forth.

2    ## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
3    ### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311(a), 1342)

4    74.    Plaintiff incorporates the allegations contained in the above paragraphs as though

5    fully set forth herein.

6    75.    Plaintiff is informed and believes, and thereupon alleges, that since at least

7    January 29, 2010, Defendants have been discharging polluted storm water into Oat Valley

8    Creek, which flows to the Russian River, and ultimately the Pacific Ocean, in violation of the

9    Permit.

10    76.    During every significant rain event, storm water flowing over and through

11    materials at the Facility becomes contaminated with pollutants, and discharges into Oat Valley

12    Creek, which flows to the Russian River, and ultimately the Pacific Ocean.

13    77.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

14    contaminated storm water are causing pollution and contamination of waters of the United States

15    in violation of Discharge Prohibition A(2) of the Permit.

16    78.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

17    contaminated storm water are adversely affecting human health and the environment in

18    violation of Receiving Water Limitation C(1) of the Permit.

19    79.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

20    contaminated storm water are contributing to the violation of the applicable water quality

21    standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's

22    Basin Plan in violation of Receiving Water Limitation C(2) of the Permit.

23    80.    Plaintiff is informed and believes, and thereupon alleges, that every day since

24    January 29, 2010, that Defendants have discharged in violation of the Permit is a separate and

25    distinct violation of Section 301(a) and Section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

26    81.    Continuing commission of the acts and omissions alleged herein irreparably harms

27    water quality, Plaintiff and its members, for which harm Plaintiff has no plain, speedy, or

28

COMPLAINT FOR
DECLARATORY AND INJUNCTIVE            21
RELIEF & CIVIL PENALTIES

adequate remedy at law.

Wherefore Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop and Implement An Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff realleges and incorporates the preceding Paragraphs, as if fully set forth herein.

83.     Section A and Provision E of the Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

84.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' discharges of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

85.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to revise the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

86.     Each day since January 29, 2010 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) and 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

87.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiff and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

Wherefore Plaintiff prays for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION
**Failure to Adequately Develop and Implement a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

88.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

89.     Section B of the Permit requires dischargers of storm water associated with industrial activity to develop and implement a Monitoring and Reporting Program (including, *inter alia*, sampling and analysis of discharges).

90.     Defendants have failed to develop and implement an adequate Monitoring and Reporting Program for the Facility.  Defendants' ongoing failure to develop and implement an adequate monitoring and reporting program is evidenced by, *inter alia*, their failure to collect qualifying storm water samples during at least two rain events during three of the last five wet seasons, to analyze storm water for all required pollutants, and to employ adequate testing methods.

91.     Each day since January 29, 2010 that Defendants have failed to develop and implement an adequate Monitoring and Reporting Program for the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) and Section 402 of the Act, 33 U.S.C. § 1311(a), 1342.

92.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiff and its members, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

Wherefore Plaintiff prays for relief as hereinafter set forth.

### FIFTH CAUSE OF ACTION
**Failure to Address Discharges Contributing to Exceedances of Water Quality Standards**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311(a), 1342)**

93.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

94.     Plaintiff is informed and believes, and thereupon alleges, that Defendants are discharging elevated levels of TSS, pH, COD, BOD, TOC, Zinc, and Magnesium and other unmonitored pollutants at impermissible levels, but that for each pollutant exceedance, Defendants have failed to submit the requisite report within 60 days of becoming aware that their storm water discharges have exceeded the EPA Benchmark Values and applicable water quality standards.

95.     Each time since January 29, 2010, that Defendants have failed to submit the requisite report following a pollutant exceedance in violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Permit is a separate and distinct violation of Section 301(a) and Section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

96.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiff and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

Wherefore Plaintiff prays for relief as hereinafter set forth.

### SIXTH CAUSE OF ACTION
**Failure to File Timely and Accurate Annual Reports as Required by the Permit**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

97.     Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

98.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have falsely certified compliance with the Permit in each of the Annual Reports submitted to the Regional Board since at least January 29, 2010.

99.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have submitted incomplete Annual Reports, in that Defendants have failed to sample storm water discharges occurring during the first storms of the past four wet seasons. Further, Defendants have failed to sample from qualifying storm events in two of the last five Wet Seasons in violation of the Permit.

100.     Each time since January 29, 2010 that Defendants have failed to file timely, complete and accurate Annual Reports is a separate and distinct violation of the Permit and the Section 301(a) and Section 402 of the Act, 33 U.S.C. §§ 1311(a), 1342.

101.     Continuing commission of the acts and omissions alleged herein irreparably harms water quality, Plaintiff and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

Wherefore Plaintiff prays for relief as hereinafter set forth.

## VI.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendants from discharging polluted storm water and non-storm water from the Facility unless in compliance with the Permit and the Act;

c.    Enjoin Defendants from further violating the substantive and procedural requirements of the Permit and the Act;

d.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that satisfy BAT or BCT standards as applicable and prevent pollutants in the facility's storm water from contributing to violations of any applicable water quality standards;

e.    Order Defendants to provide Plaintiff with reports documenting the quality and quantity of its discharges to waters of the United States and its efforts to comply with the Act and the Court's orders;

f.    Order Defendants to pay civil penalties of $37,500 per day per violation for all violations of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202) (Dec. 31, 1996);

g.    Order Defendants to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by its activities;

h.    Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

i.    Award any such other and further relief as this Court may deem appropriate.

Dated:  March 31, 2015              Respectfully submitted,
                                    LAW OFFICES OF ANDREW L. PACKARD
                                    SUPER LAW GROUP, LLC.


                                    By:  _//s//_____
                                        Andrew L. Packard
                                        Attorneys for Plaintiff
                                        California Sportfishing Protection Alliance

**EXHIBIT A**



January 29, 2015

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Roger Burch, President                         Zeke Sechrest, General Manager
Pacific States Industries, Inc.                Redwood Empire Sawmill
P.O. Box 1300                                  31401 McCray Road
Morgan Hill, California 95038                  Cloverdale, California 95425

Austin L. Vanderhoof                           Roger Burch, Agent for Service of Process
Agent for Service of Process                   North Cloverdale Boulevard, LLC
Pacific States Industries, Inc.                2 West Santa Clara Street, 9th Floor
18625 Sutter Boulevard, Suite 900             San Jose, California 95113
Morgan Hill, California 95037

Nolan Schweikl, Operations Manager
Redwood Empire Sawmill
P.O. Box 156
Cloverdale, California 95425

**Re:** **<u>Notice of Violations and Intent to File Suit</u>**
**<u>Under the Federal Water Pollution Control Act</u>**

Dear Messrs. Burch, Schweikl, Sechrest and Vanderhoof:

     I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in
regard to violations of the Clean Water Act ("the Act") occurring at Pacific States Industries,
Inc.'s ("Pacific States") Redwood Empire Sawmill facility located at 31401 McCray Road, in
Cloverdale, California ("the Facility"). The WDID number for the Facility is 1 49I006163.
CSPA is a non-profit public benefit corporation dedicated to the preservation, protection and
defense of the environment, wildlife and natural resources of California waters including Oat
Valley Creek, the Russian River and the Pacific Ocean. This letter is being sent to you as the
responsible owners, officers, and/or operators of the Facility. Unless otherwise noted, Pacific
States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and
Zeke Sechrest shall hereinafter be collectively referred to as "Pacific States."

Notice of Violation and Intent To File Suit
January 29, 2015
Page 2 of 21

This letter addresses Pacific States' unlawful discharges of pollutants from the Facility to Oat Valley Creek, the Russian River, and the Pacific Ocean. Pacific States is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("Permit"). Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit. Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur. *See* 40 C.F.R. § 135.2.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and Zeke Sechrest are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and Zeke Sechrest under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)) for violations of the Clean Water Act and the Permit. These violations are described more fully below.

## I.   Background.

### A.  The Clean Water Act.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges. *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements. 33 U.S.C. § 1311(a). The Permit requirement extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters. 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2(c) and (e). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *U.S. v. Moses*, 496 F.3d 984, 990-991 (9th Cir. Aug. 3, 2007), *rehearing en banc denied* (2007).

Notice of Violation and Intent To File Suit
January 29, 2015
Page 3 of 21

CSPA is informed and believes, and thereupon alleges, that Pacific States has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since January 29, 2010 or earlier.  Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Pacific States is subject to penalties for violations of the Act since January 29, 2010.

### B.  Pacific States' Facility, Water Quality Standards, and EPA Benchmarks

The Facility is located at 31401 McCray Road in the City of Cloverdale and discharges directly to Oat Valley Creek, which flows to the Russian River, and ultimately to the Pacific Ocean.  The Facility falls under Standard Industrial Classification (SIC) Codes 2411 ("Log Storage and Handling"), 2421 ("General Sawmill/Planing Mill") and 2499 ("Wood products, not classified elsewhere").  Pacific States submitted a Notice of Intent (NOI) to discharge under the Permit in 1992.  CSPA's investigations into the industrial activities conducted on the Facility's approximately 24 acres indicate that the Facility is used to load and unload, process, store, and transfer lumber, wood products, and associated industrial materials.  Pacific States collects and discharges storm water from the Facility through at least two (2) discharge points into Oat Valley Creek, which flows to the Russian River, and ultimately to the Pacific Ocean.  Oat Valley Creek, the Russian River and the Pacific Ocean are waters of the United States within the meaning of the Clean Water Act.

The North Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for the Russian River and the Pacific Ocean in the "Water Quality Control Plan for the North Coast Basin" ("Basin Plan").  The Basin Plan incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of water quality characteristics for ocean waters to ensure the reasonable protection of beneficial uses and the prevention of nuisance.  The discharge of waste shall not cause violation of these objectives."  Ocean Plan at 4.  The Ocean Plan limits the concentration of organic materials in marine sediment to levels that would not degrade marine life.  *Id*. at 6.  The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  Basin Plan at 3-4.00.  The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life."  Id.  The Basin Plan also establishes that the dissolved oxygen levels of the stretch of the Russian River to which the Facility discharges may not be depressed below 7.0 mg/L.  Basin Plan, Table 3-1.  The Basin Plan sets forth water quality objectives for dissolved metals, such as arsenic, lead, and mercury. *Id*., Table 3-4.  The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses.  Basin Plan 3-4.00.  The Basin Plan further provides that dissolved oxygen levels in the Russian River will not exceed 7.0 mg/L. *Id*.

Notice of Violation and Intent To File Suit
January 29, 2015
Page 4 of 21

The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a secondary MCL, consumer acceptance limit for Aluminum - 0.05 mg/L to 0.2 mg/L, and for Zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: Aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); Chromium – 0.5 mg/L (primary); Copper – 1.0 mg/L (secondary); Iron – 0.3 mg/L; and Zinc – 5.0 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38.  The CTR establishes the following numeric limits for freshwater surface waters: Arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); Chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); Copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); and Lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the North Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  Discharges of pollutants into a surface water body may be deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

Under the Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Pacific States: Total Suspended Solids – 100 mg/L; pH – 6-9 s.u.; Chemical Oxygen Demand – 120 mg/L; Biological Oxygen Demand – 30 mg/L; Zinc – 0.117 mg/L; and Magnesium – 0.0636 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for Total Organic Carbon – 110 mg/L.  Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to: Aluminum – 0.750 mg/L; Arsenic – 0.16854 mg/L; Copper – 0.0636 mg/L; Iron – 1.0 mg/L; Lead – 0.816 mg/L; Mercury – 0.0024 mg/L; Nitrate+Nitrite – 0.68 mg/L; Ammonia – 19.0 mg and Zinc – 0.117 mg/L.

The Permit requires Pacific States to analyze its storm water samples for Total Suspended

---

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml.

Solids (TSS), pH, Specific Conductance (SC), and Total Organic Carbon (TOC) or Oil and Grease (O&G).  Permit, Section B(5)(c)(i).  Pacific States must also analyze storm water samples for Zinc (Zn) and Chemical Oxygen Demand (COD).  (*Id.*, Section B(5)(c)(iii), Table D, Section A.)

## II.     Pacific States' Violations of the Permit.

Based on its review of available public documents, CSPA is informed and believes that Pacific States is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

### A.  Pacific States Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).

The Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  Permit, Section A(8).  Conventional pollutants are Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand, and Fecal Coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the Permit provides:  "Except as allowed in Special Conditions (D.1.) of this Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Receiving Water Limitation C(1) of the Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Pacific States has discharged and continues to discharge storm water unacceptable levels of Total Suspended Solids, pH, Chemical Oxygen Demand, Biological Oxygen Demand, Total Organic Carbon, Magnesium and Zinc (and other pollutants, not adequately monitored) in violation of the Permit.  These high pollutant levels have been documented during significant

rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Pacific States' Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.    Discharge of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/4/10 | Discharge Point 1 | TSS | 140 mg/L | 100 mg/L |
| 3/15/11 | Discharge Point 1 | TSS | 300 mg/L | 100 mg/L |
| 3/16/12 | Discharge Point 1 | TSS | 140 mg/L | 100 mg/L |
| 3/20/13 | Discharge Point 1 | TSS | 150 mg/L | 100 mg/L |
| 4/04/13 | Discharge Point 1 | TSS | 140 mg/L | 100 mg/L |
| 2/26/14 | Discharge Point 1 | TSS | 300 mg/L | 100 mg/L |
| 4/1/14 | Discharge Point 1 | TSS | 230 mg/L | 100 mg/L |

**2.    Discharge of Storm Water Containing pH Levels Outside Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 11/30/12 | Discharge Point 1 | pH | 5.9 s.u. | 6.0-9.0 s.u. |

**3.** **Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/4/10 | Discharge Point 1 | COD | 200 mg/L | 120 mg/L |
| 2/24/10 | Discharge Point 1 | COD | 140 mg/L | 120 mg/L |
| 10/29/10 | Discharge Point 1 | COD | 410 mg/L | 120 mg/L |
| 2/16/11 | Discharge Point 1 | COD | 180 mg/L | 120 mg/L |
| 3/2/11 | Discharge Point 1 | COD | 180 mg/L | 120 mg/L |
| 3/15/11 | Discharge Point 1 | COD | 230 mg/L | 120 mg/L |
| 1/20/12 | Discharge Point 1 | COD | 340 mg/L | 120 mg/L |
| 1/23/12 | Discharge Point 1 | COD | 250 mg/L | 120 mg/L |
| 2/7/12 | Discharge Point 1 | COD | 220 mg/L | 120 mg/L |
| 3/13/12 | Discharge Point 1 | COD | 240 mg/L | 120 mg/L |
| 3/16/12 | Discharge Point 1 | COD | 280 mg/L | 120 mg/L |
| 10/22/12 | Discharge Point 1 | COD | 360 mg/L | 120 mg/L |
| 11/17/12 | Discharge Point 1 | COD | 310 mg/L | 120 mg/L |
| 11/30/12 | Discharge Point 1 | COD | 220 mg/L | 120 mg/L |
| 3/20/13 | Discharge Point 1 | COD | 230 mg/L | 120 mg/L |
| 4/4/13 | Discharge Point 1 | COD | 260 mg/L | 120 mg/L |
| 11/20/13 | Discharge Point 1 | COD | 400 mg/L | 120 mg/L |

Notice of Violation and Intent To File Suit
January 29, 2015
Page 8 of 21

| 2/6/14 | Discharge Point 1 | COD | 270 mg/L | 120 mg/L |
|--------|-------------------|-----|----------|----------|
| 2/26/14 | Discharge Point 1 | COD | 410 mg/L | 120 mg/L |
| 2/27/14 | Discharge Point 1 | COD | 290 mg/L | 120 mg/L |
| 2/28/14 | Discharge Point 1 | COD | 220 mg/L | 120 mg/L |
| 3/26/14 | Discharge Point 1 | COD | 240 mg/L | 120 mg/L |
| 4/1/14 | Discharge Point 1 | COD | 240 mg/L | 120 mg/L |

**4.    Discharge of Storm Water Containing Biological Oxygen Demand (BOD) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/4/10 | Discharge Point 1 | BOD | 71 mg/L | 30 mg/L |
| 2/24/10 | Discharge Point 1 | BOD | 40 mg/L | 30 mg/L |
| 10/29/10 | Discharge Point 1 | BOD | 84 mg/L | 30 mg/L |
| 2/16/11 | Discharge Point 1 | BOD | 55 mg/L | 30 mg/L |
| 3/2/11 | Discharge Point 1 | BOD | 56 mg/L | 30 mg/L |
| 3/15/11 | Discharge Point 1 | BOD | 41 mg/L | 30 mg/L |
| 1/20/12 | Discharge Point 1 | BOD | 140 mg/L | 30 mg/L |
| 1/23/12 | Discharge Point 1 | BOD | 89 mg/L | 30 mg/L |
| 2/7/12 | Discharge Point 1 | BOD | 68 mg/L | 30 mg/L |
| 3/13/12 | Discharge Point 1 | BOD | 83 mg/L | 30 mg/L |
| 3/16/12 | Discharge Point 1 | BOD | 77 mg/L | 30 mg/L |

Notice of Violation and Intent To File Suit
January 29, 2015
Page 9 of 21

| | | | | |
|---|---|---|---|---|
| 10/22/12 | Discharge Point 1 | BOD | 100 mg/L | 30 mg/L |
| 11/17/12 | Discharge Point 1 | BOD | 200 mg/L | 30 mg/L |
| 11/30/12 | Discharge Point 1 | BOD | 67 mg/L | 30 mg/L |
| 3/6/13 | Discharge Point 1 | BOD | 94 mg/L | 30 mg/L |
| 3/20/13 | Discharge Point 1 | BOD | 59 mg/L | 30 mg/L |
| 4/4/13 | Discharge Point 1 | BOD | 72 mg/L | 30 mg/L |
| 11/20/13 | Discharge Point 1 | BOD | 160 mg/L | 30 mg/L |
| 2/6/14 | Discharge Point 1 | BOD | 100 mg/L | 30 mg/L |
| 2/26/14 | Discharge Point 1 | BOD | 71 mg/L | 30 mg/L |
| 2/27/14 | Discharge Point 1 | BOD | 84 mg/L | 30 mg/L |
| 2/28/14 | Discharge Point 1 | BOD | 68 mg/L | 30 mg/L |
| 3/26/2014 | Discharge Point 1 | BOD | 83 mg/L | 30 mg/L |
| 4/1/2014 | Discharge Point 1 | BOD | 70 mg/L | 30 mg/L |

**5.      Discharge of Storm Water Containing Total Organic Carbon (TOC) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 10/29/10 | Discharge Point 1 | TOC | 112 mg/L | 110 mg/L |
| 10/22/12 | Discharge Point 1 | TOC | 125 mg/L | 110 mg/L |
| 11/20/13 | Discharge Point 1 | TOC | 145 mg/L | 110 mg/L |

Notice of Violation and Intent To File Suit
January 29, 2015
Page 10 of 21

| 2/27/14 | Discharge Point 1 | TOC | 201 mg/L | 110 mg/L |
|---------|-------------------|-----|----------|----------|

**6.** **Discharge of Storm Water Containing Zinc (Zn) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 10/29/10 | Discharge Point 1 | Zn | 0.15 mg/L | 0.117 mg/L |
| 2/16/11 | Discharge Point 1 | Zn | 0.13 mg/L | 0.117 mg/L |
| 3/15/11 | Discharge Point 1 | Zn | 0.26 mg/L | 0.117 mg/L |
| 1/20/12 | Discharge Point 1 | Zn | 0.17 mg/L | 0.117 mg/L |
| 2/7/12 | Discharge Point 1 | Zn | 0.12 mg/L | 0.117 mg/L |
| 3/13/12 | Discharge Point 1 | Zn | 0.14 mg/L | 0.117 mg/L |
| 3/16/12 | Discharge Point 1 | Zn | 0.14 mg/L | 0.117 mg/L |
| 10/22/12 | Discharge Point 1 | Zn | 0.22 mg/L | 0.117 mg/L |
| 11/17/12 | Discharge Point 1 | Zn | 0.12 mg/L | 0.117 mg/L |
| 3/20/13 | Discharge Point 1 | Zn | 0.17 mg/L | 0.117 mg/L |
| 4/4/13 | Discharge Point 1 | Zn | 0.15 mg/L | 0.117 mg/L |
| 11/20/13 | Discharge Point 1 | Zn | 0.12 mg/L | 0.117 mg/L |
| 2/26/14 | Discharge Point 1 | Zn | 0.38 mg/L | 0.117 mg/L |
| 4/1/14 | Discharge Point 1 | Zn | 0.14 mg/L | 0.117 mg/L |

7.    **Discharge of Storm Water Containing Magnesium (Mg) at Concentrations in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 2/4/10 | Discharge Point 1 | Mg | 13 mg/L | 0.0636 mg/L |
| 2/24/10 | Discharge Point 1 | Mg | 8 mg/L | 0.0636 mg/L |
| 10/29/10 | Discharge Point 1 | Mg | 3.1 mg/L | 0.0636 mg/L |
| 12/22/10 | Discharge Point 1 | Mg | 9.1 mg/L | 0.0636 mg/L |
| 2/16/11 | Discharge Point 1 | Mg | 5.8 mg/L | 0.0636 mg/L |
| 3/2/11 | Discharge Point 1 | Mg | 3.6 mg/L | 0.0636 mg/L |
| 3/15/11 | Discharge Point 1 | Mg | 8.9 mg/L | 0.0636 mg/L |
| 1/20/12 | Discharge Point 1 | Mg | 3.5 mg/L | 0.0636 mg/L |
| 1/23/12 | Discharge Point 1 | Mg | 1.8 mg/L | 0.0636 mg/L |
| 1/23/12 | Discharge Point RW1 | Mg | 9.8 mg/L | 0.0636 mg/L |
| 1/23/12 | Discharge Point RW2 | Mg | 10 mg/L | 0.0636 mg/L |
| 2/7/12 | Discharge Point 1 | Mg | 2 mg/L | 0.0636 mg/L |
| 3/13/12 | Discharge Point 1 | Mg | 33 mg/L | 0.0636 mg/L |
| 3/16/12 | Discharge Point 1 | Mg | 4.6 mg/L | 0.0636 mg/L |
| 10/22/12 | Discharge Point 1 | Mg | 4.6 mg/L | 0.0636 mg/L |
| 11/17/12 | Discharge Point 1 | Mg | 2.9 mg/L | 0.0636 mg/L |
| 11/30/12 | Discharge Point 1 | Mg | 2.2 mg/L | 0.0636 mg/L |

Notice of Violation and Intent To File Suit
January 29, 2015
Page 12 of 21

| 3/06/13 | Discharge Point 1 | Mg | 2.3 mg/L | 0.0636 mg/L |
|---------|-------------------|-----|----------|-------------|
| 3/20/13 | Discharge Point 1 | Mg | 5.2 mg/L | 0.0636 mg/L |
| 4/04/13 | Discharge Point 1 | Mg | 3.4 mg/L | 0.0636 mg/L |
| 11/20/13 | Discharge Point 1 | Mg | 3.9 mg/L | 0.0636 mg/L |
| 2/6/14 | Discharge Point 1 | Mg | 2.3 mg/L | 0.0636 mg/L |
| 2/26/14 | Discharge Point 1 | Mg | 16 mg/L | 0.0636 mg/L |
| 2/27/14 | Discharge Point 1 | Mg | 4.4 mg/L | 0.0636 mg/L |
| 2/28/14 | Discharge Point 1 | Mg | 2.6 mg/L | 0.0636 mg/L |
| 3/26/14 | Discharge Point 1 | Mg | 3.7 mg/L | 0.0636 mg/L |
| 4/1/14 | Discharge Point 1 | Mg | 14 mg/L | 0.0636 mg/L |

The above samples demonstrate violations of Effluent Limitation B(3). CSPA's investigations, including a review of Pacific States' analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark level for Total Organic Carbon, indicates that Pacific States has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, pH, Chemical Oxygen Demand, Biological Oxygen Demand, Total Organic Carbon, Zinc, and Magnesium in violation of Effluent Limitation B(3) of the Permit.  Pacific States was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations. Thus, Pacific States is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The above sample data demonstrates that Pacific States' discharges adversely impact human health or the environment in violation of Receiving Water Limitation C(1) of the Permit, and that these discharges cause or threaten to cause pollution, contamination or nuisance in violation of Discharge Prohibition A(2).  The above samples may also constitute violations of Receiving Water Limitation C(2) of the Permit, with respect to the discharge of parameters for which Pacific States has failed to undertake testing and which cause or contribute to an exceedance of applicable water quality standards, including CTR limits.

CSPA is informed and believes that Pacific States has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least January 29, 2010.  CSPA alleges that such violations also have occurred and will occur on

other rain dates, including during every rain event at the Facility since January 29, 2010, in which 0.1 inches of rain or more has occurred, and that will occur, subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Pacific States has discharged storm water containing impermissible levels of Total Suspended Solids, pH, Chemical Oxygen Demand, Biological Oxygen Demand, Total Organic Carbon, Zinc, and Magnesium in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the Permit.

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Pacific States is subject to penalties for violations of the Permit and the Act since January 29, 2010.

**B.      Pacific States Has Failed to Implement BAT and BCT**.

Effluent Limitation B(3) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. Permit, Section A(8). CSPA's investigations, and the Facility's exceedances of EPA benchmarks explained above, indicate that Pacific States has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, pH, Chemical Oxygen Demand, Biological Oxygen Demand, Total Organic Carbon, Zinc, and Magnesium and other unmonitored pollutants in violation of Effluent Limitation B(3) of the Permit.

To meet the BAT/BCT requirement of the Permit, Pacific States must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility. Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Pacific States must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. Pacific States has failed to adequately implement such measures.

Pacific States was required to have implemented BAT and BCT by no later than October 1, 1992. Therefore, Pacific States has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT. Pacific States is subject to penalties for violations of the Permit and the Act occurring since January 29, 2010.

Notice of Violation and Intent To File Suit
January 29, 2015
Page 14 of 21

     **C.**     **Pacific States Has Failed to Implement an Adequate Monitoring & Reporting Program.**

     Section B of the Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Program by no later than October 1, 1992 or the start of operations. Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  Wet Season is defined in the General Permit as the period from October 1 through May 30.  Permit Section B(5)(a).  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for Total Suspended Solids, Specific Conductance, pH, and Total Organic Carbon.  Oil and Grease may be substituted for Total Organic Carbon.  Section B(5)(c)(ii) of the Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Section B(10) of the Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [Permit] Section B.2."

     Based on their investigations, CSPA is informed and believes that Pacific States has failed to develop and implement an adequate Monitoring and Reporting Plan.  As an initial matter, based on its review of publicly available documents, CSPA is informed and believes that Pacific States has failed to collect storm water samples during at least two qualifying storms events, as defined by the Permit, during at least three of the past five Wet Seasons.  Furthermore, Pacific States has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility including: Aluminum – 0.750 mg/L; Arsenic – 0.16854 mg/L; Copper – 0.0636 mg/L; Iron – 1.0 mg/L; Lead – 0.816 mg/L; Mercury – 0.0024 mg/L; Nitrate+Nitrite – 0.68 mg/L; Ammonia – 19.0 mg/L and Zinc -- 0.117 mg/L.  Moreover, Pacific States has failed to employ adequate testing methods and adequate detection limits in violation of the Permit.

     Each of these failures constitutes a separate and ongoing violation of the Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, Pacific States is subject to penalties for violations of the Permit and the Act since January 29, 2010.  These violations are set forth in greater detail below.

     **1.**     **Pacific States Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events During Three of The Last Five Wet Seasons.**

     Based on its review of publicly available documents, CSPA is informed and believes that Pacific States has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during three of the past five Wet Seasons, as required

Notice of Violation and Intent To File Suit
January 29, 2015
Page 15 of 21

by the Permit.  This is so, even though there were many qualifying storm events from which to sample (discussed further below).

For the past three Wet Seasons, Pacific States has either reported that it did not sample the first qualifying storm event of the season or has falsely reported that it had sampled the first qualifying storm event of the season, when in fact Pacific States failed to do so.  For example, Pacific States reported in its 2010-2011 Annual Report that it sampled the first qualifying storm event of the Wet Season, but Pacific States' first sample is from October 29, 2010.  Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2010-2011 Wet Season occurred as early as October 23, 2010, when 1.36" of rain fell on the Facility.  These failures to adequately monitor storm water discharges constitute separate and ongoing violations of the Permit and the Act.

## 2. Pacific States' Failure to Analyze Storm Water Samples for All Required Constituents.

The Permit requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  Permit Section B(5)(c)(ii).  CSPA is informed and believes that Pacific States has violated the General Permit by failing to analyze samples for pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility during the past five Wet Seasons including: Aluminum – 0.750 mg/L; Arsenic – 0.16854 mg/L; Copper – 0.0636 mg/L; Iron – 1.0 mg/L; Lead – 0.816 mg/L; Mercury – 0.0024 mg/L; Nitrate+Nitrite – 0.68 mg/L; Ammonia – 19.0 mg/L and Zinc -- 0.117 mg/L.

Each failure to sample for all required constituents is a separate and distinct violation of the Permit and Clean Water Act.  Accordingly, Pacific States is subject to penalties for these violations of the Permit and the Act since January 29, 2010.

## 3. Pacific States' Failure to Employ Adequate Testing Methods in Violation of the Permit Since January 29, 2010.

Pacific States is in violation of the Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program."  Permit Section B.10.a.iii.

The Regional Board has determined the appropriate laboratory test methods to employ when analyzing storm water samples for the presence and concentration of various pollutants, as well as the appropriate detection limits for those testing methods.  However, in every single annual report filed by Pacific States in the past five years, the test methods and detection limits employed by the laboratory utilized by Pacific States to analyze the concentration of the pollutants present in the storm water discharged from its Facility did not comply with the Regional Board requirements.  For example, the testing method Pacific States was required to apply for Chemical Oxygen Demand was SM 5220C with a detection limit of 1 mg/L.  However,

in the Annual Report filed by Pacific States in 2013-2014 the laboratory utilized test method SM 5220D with a detection limit of 50 mg/L.  Further, in the Annual Report filed by Pacific States in 2011-2012, the detection limits for Zinc and Magnesium were above the required detection limits by at least an order of magnitude.  These are just a few of many examples of Pacific States' failure to adequately test for pollutants in their storm water discharges.

Pacific States is in violation of the Permit for failing to employ laboratory test methods that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit."  Permit, Section B.2.a. ("Monitoring Program Objectives").

CSPA is informed and believes that publicly available documents demonstrate Pacific States' consistent and ongoing failure to implement an adequate Monitoring and Reporting Program in violation of Section B of the Permit.  Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Pacific States is subject to penalties for these violations of the Permit and the Act since January 29, 2010.

**D.    Pacific States Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) require dischargers who submitted an NOI pursuant to the Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Permit, Section A(4)); a list of significant materials handled and stored at the site (Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Permit requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that Pacific States has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Pacific States has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, Pacific States has been in continuous violation of Section A(1) and Provision E(2) of the Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP. Pacific States is subject to penalties for violations of the Permit and the Act occurring since January 29, 2010.

**E.     Pacific States Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Pacific States is discharging elevated levels of Total Suspended Solids, pH, Chemical Oxygen Demand, Biological Oxygen Demand, Total Organic Carbon, Zinc, and Magnesium and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards. For each of these pollutant exceedances, Pacific States was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60 days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Pacific States was aware of high levels of these pollutants long before January 29, 2010. Pacific States has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the Permit every day since January 29, 2010 and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. Pacific States is subject to penalties for violations of the Permit and the Act occurring since January 29, 2010.

**F.      Pacific States Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. Permit, Sections B(14), C(9), (10). Section A(9)(d) of the Permit requires the discharger to include in its annual report an evaluation of their storm water controls, including certifying compliance with the Permit. *See also* Permit, Sections C(9) and (10) and B(14).

CSPA's investigations indicate that Pacific States has submitted incomplete Annual Reports and purported to comply with the Permit despite significant noncompliance at the Facility. For example, Pacific States reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2009-2010, 2010-2011, 2011-2012 and 2013-2014) that it observed storm water discharges occurring during the first storm of those Wet Seasons. However, based on CSPA's review of publicly available rainfall data, CSPA believes this is incorrect. For example, in the 2011-2012 Annual Report Pacific States reported that it sampled the first qualifying storm event of the Wet Season, but Pacific States' first sample is from January 20, 2012. Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2011-2012 Wet Season occurred as early as October 3, 2011, when 0.85" of rain fell on the Facility. These failures to adequately monitor storm water discharges constitute separate and ongoing violations of the Permit and the Act.

Further, Pacific States failed to sample from qualifying storm events in two of last five Wet Seasons in violation of the Permit. For example in the 2010-2011 Annual Report Pacific States reported that it sampled from five qualifying storm events throughout the wet season. However CSPA is informed and believes none of those samples were taken during a qualifying storm event. For example, Pacific States reported that it sampled from a storm that occurred at the Facility on February 16, 2011. However based on publicly available rainfall data CSPA is informed and believes February 16, 2011 was not a qualifying storm event because 0.24 inches of rain fell on the Facility on February 15, 2011. Thus, the February 15th storm event rendered any storm occurring for three days afterwards non-qualifying under the Permit.

These are but a few examples of how Pacific States has failed to file completely true and accurate reports. As indicated above, Pacific States has failed to comply with the Permit and the Act consistently for the past five years; therefore, Pacific States has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time Pacific States submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years.

Notice of Violation and Intent To File Suit
January 29, 2015
Page 19 of 21

CSPA hereby notifies Pacific States that it intends to sue regarding all such violations.  Pacific States' failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  Pacific States is subject to penalties for violations of Section (C) of the Permit and the Act occurring since January 29, 2010.

**IV.    Persons Responsible for the Violations.**

CSPA puts Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweik, and Zeke Sechrest on notice that they are the persons and entities responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and Zeke Sechrest on formal notice that it intends to include those persons in this action.

**V.    Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows: California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067

**VI.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
John J. Prager
LAW OFFICES OF ANDREW L. PACKARD
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com

Reed W. Super
Edan Rotenberg
SUPER LAW GROUP, LLC
411 State Street, #2R
Brooklyn, New York 11217
Tel. (212) 242-2355
Email: Reed@superlawgroup.com

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and Zeke Sechrest to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Pacific States Industries, Inc., North Cloverdale Boulevard, LLC, Roger Burch, Nolan Schweikl and Zeke Sechrest and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

Notice of Violation and Intent To File Suit
January 29, 2015
Page 21 of 21

## <u>SERVICE LIST</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Matthias St. John, Executive Officer
Regional Water Quality Control Board
North Coast Region
5550 Skylane Blvd Suite A
Santa Rosa, CA 95403-1072

**ATTACHMENT A**
**Notice of Intent to File Suit, Pacific States Industries, Inc.**
**Significant Rain Events,* January 29, 2010 – January 29, 2015**

| | | | |
|---|---|---|---|
| January 29, 2010 | January 30, 2011 | February 29, 2012 | February 27, 2014 |
| February 4, 2010 | February 1, 2011 | March 13, 2012 | February 28, 2014 |
| February 6, 2010 | February14, 2011 | March 14, 2012 | March 1, 2014 |
| February 9, 2010 | February15, 2011 | March 16, 2012 | March 3, 2014 |
| February 12, 2010 | February16, 2011 | March 22, 2012 | March 5, 2014 |
| February 24, 2010 | February17, 2011 | March 24, 2012 | March 25, 2014 |
| February 26, 2010 | February18, 2011 | March 25, 2012 | March 26, 2014 |
| February 27, 2010 | February24, 2011 | March 27, 2012 | March 28, 2014 |
| March 3, 2010 | February25, 2011 | March 28, 2012 | March 29, 2014 |
| March 9, 2010 | March 2, 2011 | March 31, 2012 | March 31, 2014 |
| March 11, 2010 | March 15, 2011 | April 10, 2012 | April 1, 2014 |
| March 12, 2010 | May 1, 2011 | April 12, 2012 | April 4, 2014 |
| March 25, 2010 | May 2, 2011 | April 13, 2012 | April 25, 2014 |
| March 29, 2010 | May 5, 2011 | October 22, 2012 | September 17, 2014 |
| March 30, 2010 | May 6, 2011 | October 23, 2012 | September 18, 2014 |
| March 31, 2010 | May 10, 2011 | October 24, 2012 | September 25, 2014 |
| April 2, 2010 | May 13, 2011 | October 31, 2012 | September 26, 2014 |
| April 4, 2010 | May 15, 2011 | November 16, 2012 | October 15, 2014 |
| April 5, 2010 | May 16, 2011 | November 17, 2012 | October 20, 2014 |
| April 11, 2010 | May 17, 2011 | November 20, 2012 | October 25, 2014 |
| April 12, 2010 | May 18, 2011 | November 19, 2012 | October 31, 2014 |
| April 20, 2010 | May 19, 2011 | November 20, 2012 | November 13, 2014 |
| April 27, 2010 | May 20, 2011 | November 21, 2012 | November 19, 2014 |
| April 28, 2010 | May 22, 2011 | November 30, 2012 | November 20, 2014 |
| May 10, 2010 | May 23, 2011 | December 1, 2012 | November 22, 2014 |
| May 17, 2010 | May 24, 2011 | December 2, 2012 | November 28, 2014 |
| May 27, 2010 | May 25, 2011 | December 5, 2012 | November 29, 2014 |
| October 23, 2010 | May 26, 2011 | December 15, 2012 | November 30, 2014 |
| October 24, 2010 | April 13, 2011 | December 17, 2012 | December 1, 2014 |
| October 28, 2010 | April 20, 2011 | December 20, 2012 | December 2, 2014 |
| October 29, 2010 | April 15, 2011 | December 21, 2012 | December 3, 2014 |
| November 7, 2010 | May 15, 2011 | December 22, 2012 | December 4, 2014 |
| November 20, 2010 | May 25, 2011 | December 23, 2012 | December 5, 2014 |
| November 21, 2010 | May 31, 2011 | December 25, 2012 | December 6, 2014 |
| November 22, 2010 | June 1, 2011 | December 26, 2012 | December 8, 2014 |
| November 23, 2010 | June 4, 2011 | January 5, 2013 | December 10, 2014 |
| November 27, 2010 | June 5, 2011 | January 23, 2013 | December 11, 2014 |
| December 2, 2010 | June 28, 2011 | February 7, 2013 | December 12, 2014 |
| December 3, 2010 | October 3, 2011 | February 19, 2013 | December 15, 2014 |
| December 5, 2010 | October 4, 2011 | March 6, 2013 | December 16, 2014 |
| December 6, 2010 | October 5, 2011 | March 20, 2013 | December 17, 2014 |
| December 8, 2010 | October 6, 2011 | March 31, 2013 | December 19, 2014 |
| December 14, 2010 | October 10, 2011 | April 4, 2013 | December 20, 2014 |
| December 17, 2010 | November 11, 2011 | May 27, 2013 | January 16, 2015 |
| December 18, 2010 | November 19, 2011 | June 24, 2013 | |
| December 19, 2010 | November 20, 2011 | June 25, 2013 | |
| December 20, 2010 | November 23, 2011 | November 19, 2013 | |
| December 21, 2010 | November 24, 2011 | November 20, 2013 | |
| December 22, 2010 | December 15, 2011 | February 2, 2014 | |
| December 25, 2010 | January 19, 2012 | February 5, 2014 | |
| December 26, 2010 | January 20, 2012 | February 6, 2014 | |
| December 28, 2010 | January 21, 2012 | February 7, 2014 | |
| January 1, 2011 | January 22, 2012 | February 8, 2014 | |
| January 2, 2011 | January 23, 2012 | February 9, 2014 | |
| January 13, 2011 | February 7, 2012 | February 15, 2014 | |
| January 29, 2011 | February 10, 2012 | February 26, 2014 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.